# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

Kelly Patterson,

     Plaintiff

v.

Las Vegas Metropolitan Police Department, et al.,

     Defendants

Case No.: 2:23-cv-00539-JAD-DJA

**Order Granting in Part Motions for Summary Judgment**

[ECF Nos. 119, 121, 134, 135, 137]

Nevada's stop-and-identify statute, NRS 171.123(3), permits police officers to detain a suspect with reasonable suspicion that he has committed a crime "only to ascertain the person's identity and the suspicious circumstances surrounding the person's presence abroad."[1]  A suspect who refuses to identify himself can be arrested for obstructing the officer's investigation.  The Nevada and United States Supreme Courts have determined that an obstruction arrest under NRS 171.123(3) does not violate a suspect's constitutional rights per se, but both courts assumed that the statute requires only that a suspect must give his full name.  The primary question in this case is whether an officer may arrest a suspect who provides his full name but refuses to comply with demands for additional identifying information needed to correctly match the suspect to a record in the officer's police database.

Self-described police-accountability activist Kelly Patterson had been riding his bicycle with hundreds of cyclists one night when Officer Salim Salazar stopped him, frisked him, and handcuffed him for violating traffic laws.  She then arrested Patterson for obstruction because he gave his name and birthdate but refused to answer follow-up questions that Salazar claims she

---

[1] Nev. Rev. Stat. § 171.123(3).

needed to "fully and positively" identify him.[2]  Patterson sues the Las Vegas Metropolitan Police Department (Metro) for maintaining a policy that unconstitutionally permits officers to ask for identifying information if a name doesn't suffice to match the suspect to a hit in the department's computerized database.  He also claims that Salazar's pat-down, pre-arrest handcuffing, and eventual arrest violated the Fourth Amendment.  And because Patterson was filming the encounter, he claims that Salazar arrested him in retaliation for exercising his First Amendment rights.  He further alleges that Metro, Salazar, and the City of Las Vegas unconstitutionally and maliciously prosecuted him based on Metro's unconstitutional policy.  Among other things, he seeks an injunction prohibiting the City from prosecuting him in the future if he is arrested again for failing to provide identifying information beyond his full name.

All parties crossmove for summary judgment on most of Patterson's claims.  The net result of these motions is that some claims are resolved in Patterson's favor as to liability, others are resolved entirely in the defendants' favor, and the rest must go to a jury:

- Summary judgment is granted as to liability only in favor of Patterson and against Salazar for subjecting Patterson to an unreasonable search and seizure under the Fourth Amendment when she frisked him for weapons and handcuffed him; the issue of damages for that violation must go to trial;

- Summary judgment is granted as to liability only in favor of Patterson and against Salazar on Patterson's false-arrest claim under Article 1, Section 18 of the Nevada Constitution; the issue of damages for this violation must go to trial;

- Although Salazar's arrest of Patterson for obstruction violated the Fourth Amendment because she lacked probable cause to conclude that Patterson failed to sufficiently

---

[2] ECF No. 143 at 15.

2

identify himself, she is entitled to qualified immunity on that portion of Patterson's federal unlawful-arrest claim because the arrest didn't violate clearly established law;

- Genuine disputes of fact preclude summary judgment on whether Salazar had probable cause under the Fourth Amendment to arrest Patterson for running a stop sign, whether Salazar retaliated against Patterson for filming police officers in violation of his First Amendment rights, and whether Salazar and Metro are liable for malicious prosecution, so those claims proceed to trial;

- Salazar enjoys qualified immunity from Patterson's excessive-force claim, but his state-law battery claim must proceed to trial;

- Salazar is entitled to summary judgment on Patterson's Fifth Amendment claim because Patterson had no reasonable fear that the information Salazar requested could be used to incriminate him;

- Metro is entitled to summary judgment on all claims against it other than malicious prosecution because its interpretation of Nevada's stop-and-identify statute is constitutional and was not the moving force behind Salazar's unconstitutional conduct; and

- The City of Las Vegas is entitled to summary judgment on all claims against it because prosecuting individuals for failing to provide additional identifying information does not violate the Fourth Amendment.

**Background**

Kelly Patterson calls himself "a journalist and activist focusing on police accountability."[3] He "regularly [films] police officers performing their duties in public" and

---

[3] ECF No. 137 at 3.

3

1    engages in activism critical of the police, and he has previously gotten into dust-ups with Metro

2    over his activities.[4]  The basis of all of Patterson's claims is an approximately 30-minute

3    encounter with Officer Salim Salazar on April 14, 2021, that occurred during attempts by Metro

4    officers to subdue a large group of bicyclists riding through downtown Las Vegas.

**A.    Patterson begins filming an officer encounter after all downtown-area officers are instructed to issue citations to a large group of traffic-law-breaking cyclists.**

7        On April 14, 2021, an undisclosed officer told Metro's on-duty watch commander that

8    there were "[a]bout 300 bicyclists . . . cycling around the downtown area" of Las Vegas and that,

9    while some bicyclists "were simply out exercising [and] enjoying the mild nighttime

10   temperatures, most" of them were "disobeying traffic laws by running traffic lights and stop

11   signs."[5]  Other officers communicated via radio, starting at around 7:30 p.m., that they had

12   witnessed 100–150 bicyclists disobeying traffic laws at different street corners throughout the

13   broader downtown area.[6]

14       At 7:57 p.m., Sergeant Robert Ralston met with on-duty officers—including Officer

15   Salim Salazar—and told them to cite all of the cyclists.[7]  He conveyed that the officers "already

---

[4] *See, e.g.*, *Ballentine v. Tucker*, 28 F.4th 54 (9th Cir. 2022) (discussing a 2013 incident in which Patterson and other plaintiffs were cited for defacing property after chalking "anti-police messages" in front of Metro's headquarters and the local courthouse); ECF No. 41 in *Patterson v. Las Vegas Metro. Police Dep't*, Case No. 18-cv-00518-JCM-EJY (discussing a 2016 incident in which Patterson was arrested for obstruction because he disobeyed officer instructions to stop filming officers' interactions with other civilians).

[5] ECF No. 137-8 at 9 (21:3–8).  The parties filed compressed versions of the deposition transcripts in this case, so four deposition pages are contained in one ECF page.  When citing to those documents, I first cite the ECF pagination, and then cite the deposition pages and lines in parentheses.

[6] *See* ECF No. 137-1 (Salazar's declaration of arrest).

[7] Ralston's body-cam footage, T02:57:51Z (submitted to the court via manual filing).  The body-cam footage submitted in this case is timestamped using "Zulu Time," which is Greenwich Mean

have PC [probable cause] for every one of 'em"[8] because officers witnessed several cyclists in the group commit traffic violations.  At 8:00 p.m., Ralston had a radio discussion with Lieutenant Frank Humel, who ordered all on-duty officers to cite the cyclists under a "zero-tolerance policy."[9]  Humel reaffirmed to Ralston that his orders were to cite "just anybody, one at a time."[10]  Ralston radioed the officers in the area and instructed them to "start pulling over anyone you see."[11]  At that point, Ralston was in the Arts District neighborhood of downtown, following officers who were pulling over cyclists at the corner of Casino Center Boulevard and East Charleston Boulevard.[12]  Over the next hour, Ralston continued to press officers to cite or arrest cyclists, repeating that "we are giving tickets to everyone."[13]

Following Ralston's orders, Officer Thomas Maglich began following a group of cyclists at approximately 8:15 p.m.[14]  While he was stopped at a stop sign at 9th Street and Franklin Avenue, his body-cam captured some cyclists blow through the stop sign and turn left onto Franklin Avenue.[15]  Maglich then picked a rider to pull over—a man wearing a black jacket

---

Time (GMT).  I cite to the GMT timestamps throughout this order but convert to local Pacific Daylight Time (PDT) in text to clarify the sequence of events.

[8] *Id.* at T02:58:22–27Z.

[9] ECF No. 137-11 at 16 (49:1–5).

[10] Ralston's body-cam footage, T03:00:49–54Z.

[11] *Id.*

[12] *See generally id.* at T03:00:00–03:03:10Z.

[13] *Id.* at T03:17:57–03:58:02Z.

[14] Maglich's body-cam footage, T03:15:50Z (submitted to the court via manual filing).

[15] *Id.* at T03:16:00–03:17:00Z.

1    riding a few feet behind Patterson.[16]  The rider and Maglich passed Patterson before Maglich

2    stopped the rider and told everyone else that they were free to go.[17]

3         Patterson stopped his bicycle several feet away from Maglich and started filming his

4    encounter with the rider in the black jacket on the GoPro camera mounted on Patterson's bike's

5    handlebars.[18]  Maglich told the man he pulled over that he was being cited for failing to have a

6    taillight on his bike.[19]  He did not mention any stop-sign infractions throughout this encounter.[20]

7    Maglich radioed a request for an "additional unit" at 8:27 p.m., reporting that there were "about

8    10 bicyclists riding in circles" near him.[21]

9  **B.    Officer Salazar engages with Patterson, almost immediately frisks and handcuffs
         him, and threatens him with a trip to jail if he doesn't provide identifying
10        information beyond his name.**

11        Officer Salazar responded to Maglich's back-up request and arrived on the scene at

12   around 8:30 p.m.[22]  Her body-cam doesn't clearly show any cyclists circling the area, but she

13   saw Patterson, who was standing next to his bicycle on the sidewalk, and immediately pulled

14   over next to him.[23]  Salazar asked Patterson if he "g[o]t a ticket too" and requested that he walk

15

16

_____

17   [16] *Id.* at T03:17:00–03:17:50Z.

     [17] *Id.* at T03:18:00–03:18:26Z.

18   [18] Synced video of Maglich's body-cam and Patterson's GoPro footage, T:03:18:45Z (submitted
     to the court via manual filing).

19   [19] Maglich's body-cam footage, T03:18:55Z.

20   [20] *Id.* at T03:18:55–03:33:52Z, T03:34:18–03:36:00Z.  Maglich's body-cam footage was
     submitted in two parts because he turned off his camera for a short period of time in the middle
21   of the relevant events.

22   [21] Maglich's body-cam footage, T03:27:19Z.

     [22] Salazar's body-cam footage, T03:29:30–T03:30:00Z (submitted to the court via manual
23   filing).

     [23] *Id.*

to the front of her squad car.[24]  He declined and asked why he was being detained.  Salazar

responded, "you are being detained . . . for disobeying all traffic laws."[25]  Patterson then asked,

"what traffic law did I disobey?"  Salazar responded that "[he was] earlier," and asked if he was

"riding with the other bicycles."[26]  Patterson retorted that he would not answer any questions.[27]

Salazar repeated her request that Patterson move to the front of her car and, after a brief

exchange about where he should put his bicycle (which didn't have a kickstand), Patterson

placed his cellphone in a pack attached to his bike, left his bike next to the curb, and stepped to

the front of Salazar's patrol car.[28]

          Salazar asked Patterson if he had any weapons, and he responded, "I do not answer

questions."[29]  Salazar immediately patted him down for weapons, asked if he "happen[ed] to

have an ID on" him, placed him in handcuffs,[30] and continued asking him to identify himself:

> Salazar: So, you're not gonna tell me your name and birthday?
>
> Patterson: You didn't ask me for my name.
>
> Salazar: Do you happen to have an ID on you, yes or no?  A simple yes or no, sir.  So, you're not gonna tell me your name?
>
> Patterson: You didn't ask me for my name. . . .  You asked me if I had ID.
>
> Salazar: OK.  What's your first name?
>
> Patterson: Kelly.

---

[24] *Id.* at T03:30:10–15Z.

[25] *Id.* at T03:30:16–20Z.

[26] *Id.* at T03:30:20–40Z.

[27] *Id.*

[28] *Id.* at T03:30:40–03:31:35Z.

[29] *Id.* at T03:30:35Z.

[30] *Id.* at T03:30:40–03:32:10Z.

1     Salazar: Kelly, how do you spell that, sir?

2     Patterson: K-E-L-L-Y.

3     Salazar: K-E-A-L-L-Y? Is that correct?

4     Patterson: No. K-E-L-L-Y.

5     Salazar:  Kelly, what's your last name, sir?

6     Patterson: Patterson.

7     Salazar: Mr. Patterson, what's your birthday sir?

8     Patterson: I'm not required to tell you that.

9     Salazar: OK.  You've got 2 options.

10    Patterson:  I'm required to tell you my full name.

11    Salazar:  Correct.  You understand why . . . I stopped you?  I'm
      going to [reiterate] this once again.

12

      Patterson: You have no reason to detain me.

13

14    Salazar:  So, you want to go to jail today?  I do have a reason to
      detain you.

15    Patterson: No you don't.

16    Salazar: This is why.  We have 100, 100 plus bicycles in the
      vicinity of here riding their bicycles disobeying all traffic laws.

17    You were stopped for that reason.  You are being stopped for it.
      Everybody.  I actually cited somebody for the same thing, so you

18    do have the right to tell me your information so you can go on your
      way.

19

      Patterson: I already told you my information.

20

      Salazar:  Yeah, and I need your birthday. . . .  So, if you're not

21    gonna tell me your birthday, you're gonna go to jail for
      obstructing.  Ok, so that's gonna be a no.  I want to give you one

22    opportunity more.  What is your birthday, Mr. Patterson?

23

Patterson: I object to you detaining me.[31]

Salazar then walked over to Officer Maglich, asked whether Patterson was "also part of the group," and turned off her body-cam.[32]  Maglich responded, "oh, yeah" and then turned off his camera.[33]  Maglich and Salazar engaged in a "private conversation" in the 26 seconds during which both officers' cameras were turned off.[34]  Salazar doesn't recall any specifics of the conversation they had,[35] but Maglich testified at his deposition that he told Salazar during this time that he had witnessed Patterson run a stop sign.[36]

Maglich's comments during the incident, however, cast serious doubt on the credibility of that testimony.  Immediately after Salazar and Maglich spoke, Maglich told the man he had pulled over, "I don't know what's going on right there, I'm confused."[37]  The man told Maglich that Patterson wasn't with his group, and Maglich relayed that information to Salazar.[38]  At his deposition, Maglich acknowledged that he had reviewed Patterson's GoPro footage—which clearly shows Patterson running a stop sign—to prepare for his deposition questioning.[39]

---

[31] *Id.* at T03:32:12–03:33:48Z.

[32] *Id.* at 03:33:48–03:34:05Z.

[33] Maglich's body-cam footage, T03:34:07Z.

[34] *See* Salazar's body-cam footage, T03:33:50–03:34:05Z.

[35] ECF No. 137-3 at 73 (274:5–275:25).

[36] ECF No. 137-23 at 29 (100:1–20).

[37] Maglich's body-cam footage, T03:34:45–51Z.

[38] *Id.* at T03:35:44–51Z, T03:36:26–33Z.

[39] ECF No. 137-23 at 35 (121:13–25).

**C.**    **Salazar asks for more identifying information and, when Patterson refuses to provide his address, she arrests him for obstruction and disobeying traffic laws.**

After Salazar spoke with Maglich, she returned to her car to conduct a records search for Patterson.[40]  She told Maglich that she couldn't identify him based on his first and last name, exclaiming, "He's refusing to give me his birthday.  If I can't find him, he's going to go to jail for obstructing."[41]  About a minute later, Salazar told Patterson that she couldn't find him in the system and again demanded that he provide his birthdate, warning that if he didn't, he'd go to jail for obstruction.[42]  Under threat of arrest, Patterson told Salazar his birthdate and that his middle name is Wayne.[43]

The queries that Salazar ran with this information through Metro's computer database (often referred to as SCOPE) returned three entries for "Kelly Patterson" that Salazar testified she could not narrow down to confirm which one matched the bicyclist in front of her: a female "Kelly Patterson" born in 1949, a male "Kelly Wayne Patterson" with Patterson's 1969 birthdate, and a male "Kelly W. Patterson" with the same birthdate, social-security number, sex, height, weight, and hair and eye color as the entry for Kelly Wayne Patterson.[44]  Salazar still maintained that she could not positively identify Patterson, so she asked him to confirm his address.[45]  He refused, and Salazar told him that he was going to jail.[46]  Salazar's declaration of

---

[40] Maglich's body-cam footage, T03:35:00–03:36:50Z.  This sequence of evidence is captured on Maglich's body-cam because Salazar didn't turn her body-cam back on until 19 minutes later, after her encounter with Patterson had ended.  *See* ECF No. 137-3 at 52 (189:3–192:17).

[41] Maglich's body-cam footage, T03:36:30–35Z.

[42] *Id.* at T03:37:45–48Z.

[43] *Id.* at T03:38:00–46Z.

[44] *See* ECF No. 137-3 at 66–71 (247:20–266:18) (Salazar's deposition, discussing the SCOPE entries).

[45] ECF No. 137-1 at 3.

1  arrest explains that she arrested Patterson for disobeying traffic laws and obstructing a public

2  officer:

> Due to the fact that Kelly was with a group of bicyclists that were
> disobeying traffic laws, Kelly was arrested for Upon Roadway
> Bicycle Rider must Obey All Traffic Laws NRS 484B.763.  Due to
> the fact that Kelly was willfully delaying a public officer (S.
> Salazar) in the lawful discharge of her official duties (conducting a
> person stop for a bicyclist disobeying traffic law[s]) by Kelly
> refusing to answer questing pertaining to positively identify him,
> Kelly was arrested for Obstructing a Public Officer NRS
> 197.190.[47]

**D.    The City of Las Vegas charges Patterson with obstruction and disobeying traffic laws, but both charges are eventually dismissed.**

10        Patterson was charged with obstruction under NRS 197.190 for "refusing to answer

11  questions from said officer pertaining to his identity" and for a traffic violation under Las Vegas

12  Municipal Code 10.02.010, NRS 484B.307, and NRS 484B.763 for failing "to stop at an

13  intersection where a traffic control device directing such a stop was erected at or near the

14  entrance to such approaching intersection."[48]  Patterson, through counsel, asked the assigned city

15  attorneys to dismiss the obstruction charge, arguing that the United States Supreme Court and the

16  Nevada Supreme Court had interpreted Nevada's identification statute, NRS 171.123(3), to

17  permit officers to require a suspect detained during a reasonable-suspicion stop to give only his

18  name.[49]  Because Patterson gave his full name during his encounter with Salazar, his counsel

19  argued, the charge was unfounded.[50]

---

[46] Maglich's body-cam footage, T03:42:39Z.

[47] ECF No. 137-1 at 3.

[48] ECF No. 119-11 at 2 (Patterson's criminal complaint).

[49] *See* ECF No. 119-15.

[50] *Id.*

The City didn't yield, so Patterson's counsel filed a motion to dismiss for vindictive prosecution.[51]  In response, the City proposed amending the obstruction charge to instead allege that Patterson refused to obey Salazar's "commands to go to the front of her patrol vehicle," recognizing that Patterson did in fact identify himself by giving his full name and date of birth.[52] Las Vegas Municipal Court Judge Cedric Kerns noted that Patterson "is correct in that [he] is only required to give an officer [his] legal name or required information for identification," but he allowed the City to amend its complaint.[53]  Patterson moved to dismiss the amended obstruction charge and, after an evidentiary hearing, Judge Kerns granted that motion, noting that he believed Salazar and Patterson were engaging in "constitutionally protected dialogue" when Salazar asked Patterson to move to the front of her police car and Patterson declined.[54]  The traffic count was later dismissed, too, and Patterson's case was closed on February 22, 2023.[55]

**E.      Patterson sues Metro, Salazar, and the City of Las Vegas.**

In April 2023, Patterson filed this action against Metro, Salazar, and the City of Las Vegas over the circumstances surrounding his detention, arrest, and prosecution.[56]  He alleges that Salazar violated his First Amendment rights by detaining him "in retaliation for . . . filming public polic[e] conduct."[57]  According to Patterson, Salazar also violated his Fourth Amendment

---

[51] *Id.*

[52] ECF No. 119-16 at 4; ECF No. 128-9 at 17 (52:19–53:22) (depo. testimony of Carline Helbert, the City's Fed. R. Civ. P. 30(b)(6) witness).

[53] ECF No. 119-1 at 2.

[54] ECF No. 134-10 at 69.

[55] *See* ECF No. 128-13 at 2, ¶¶ 6–7 (affidavit of Carlene Helbert).

[56] Patterson originally sued former Metro Sheriff Joe Lombardo, too, alleging that he was a final policymaker and thus liable for punitive damages.  ECF No. 1 at 12, 88–104.  I dismissed the claims against Lombardo with leave to amend, but Patterson chose not to amend his complaint. *See* ECF No. 118.

[57] ECF No. 1 at 7, ¶ 45.

rights by "demanding additional identification information beyond what was required by Nevada law" and arresting him for refusing to provide it.[58]  He also claims that Salazar's decision to frisk him for weapons and handcuff him was unconstitutional and that Salazar used excessive force and arrested him without probable cause.[59]  Patterson brings similar claims under the Nevada Constitution and state law.[60]

Patterson also contends that Metro's policy of permitting officers to require suspects to provide identifying information like their birthdates, and permitting officers to arrest suspects who refuse, is unconstitutional under the Fourth, Fifth, and Fourteenth Amendments.  He relies on a line of cases in which the Nevada Supreme Court and United States Supreme Court held that officers could require—under threat of arrest—a suspect to give his name under NRS 171.123(3) without violating the Fourth Amendment.[61]  And because Salazar's arrest for obstruction was based on Metro's unconstitutional policy, Patterson argues, Metro is also liable for Salazar's conduct under the municipal-liability principles established in *Monell v. Department of Social Services*.[62]  Patterson sues all defendants for malicious prosecution, too,[63] and he seeks injunctive relief against Metro and the City of Las Vegas to prevent them from arresting or prosecuting him if he refuses to provide more than his name during a reasonable-suspicion stop in the future.[64]

---

[58] *Id.* at 7, ¶ 46.

[59] *Id.* at 7, ¶¶ 47–48.

[60] *Id.* at 8–10, ¶¶ 53–67; 11, ¶¶ 77–81.

[61] *Id.* at 2, ¶¶ 5–8.

[62] *Monell v. Dep't of Soc. Servs of N.Y.*, 436 U.S. 658 (1978).

[63] ECF No. 1 at 10, ¶¶ 68–76.

[64] *Id.* at 14–15.

All parties now move for summary judgment.  Metro argues that its policy permitting officers to require a suspect to provide identifying information sufficient to verify the suspect's identity in the officer's computer database is constitutional.[65]  Salazar contends that she had probable cause to arrest Patterson, so her actions during the stop were permissible.[66]  She also contends that Patterson has no evidence to support his claims under the First and Fifth Amendments, his malicious-prosecution claim, or his excessive-force and battery claims.  She alternatively argues that she is entitled to qualified immunity from most of his constitutional claims.[67]  The City contends that Patterson didn't plead any valid claims against it and the injunctive relief he seeks is unavailable.[68]  For his part, Patterson moves for partial summary judgment against all three defendants, arguing that Salazar's actions were unconstitutional under the Fourth Amendment,[69] Metro's interpretation of NRS 171.123(3) is inconsistent with binding precedent,[70] and the City of Las Vegas thus cannot constitutionally prosecute him in the future based on that interpretation.[71]

## Discussion

### A.    Standards for summary judgment

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[72]  The moving party bears the initial responsibility of

---

[65] ECF No. 135.

[66] *Id.*

[67] *Id.*

[68] ECF No. 134.

[69] ECF No. 137.

[70] ECF No. 121.

[71] ECF No. 119.

[72] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

1  presenting the basis for its motion and identifying the portions of the record or affidavits that

2  demonstrate the absence of a genuine issue of material fact.[73]  If the moving party satisfies its

3  burden with a properly supported motion, the burden then shifts to the opposing party to present

4  specific facts that show a genuine issue for trial.[74]  "When simultaneous cross-motions for

5  summary judgment on the same claim are before the court, the court must consider the

6  appropriate evidentiary material identified and submitted in support of"—and against—"both

7  motions before ruling on each of them."[75]

8  **B.  Metro's interpretation of NRS 171.123(3) is not unconstitutional.**

9        Patterson moves for summary judgment against Metro on "the discrete legal issue of

10  whether [Metro's] official policy that allows its officers to require a suspect to give additional

11  identifying information, when they only provide their name in a reasonable-suspicion stop, [i]s

12  unconstitutional."[76]  NRS 171.123(3), the statute Patterson challenges, states that an officer can

13  detain a person "only to ascertain the person's identity and the suspicious circumstances

14  surrounding the person's presence abroad.  Any person so detained shall identify himself or

15  herself, but may not be compelled to answer any other inquiry of any peace officer."[77]  The

16  Nevada Supreme Court has described NRS 171.123 as "the Nevada codification of"[78] the

17  doctrine described by the United States Supreme Court in *Terry v. Ohio*, which permits police

18

---

19  [73] *Id*. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

20  [74] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

21  [75] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

22  [76] ECF No. 121 at 2.

23  [77] Nev. Rev. Stat. § 171.123(3).

   [78] *State v. Lisenbee*, 13 P.3d 947, 950 (Nev. 2000).

1    officers to briefly stop an individual if there exists a reasonable suspicion that the person has

2    committed or is about to commit a crime.[79]

3            In *Hiibel v. Sixth Judicial District Court*, the Nevada Supreme Court (*Hiibel I*) and then

4    the United States Supreme Court (*Hiibel II*) ruled that an obstruction arrest for failure to identify

5    under NRS 171.123(3) did not offend the Fourth or Fifth Amendments under the assumption that

6    the statute required a suspect to give just his name.[80]  But Metro's policy trains officers that they

7    can demand more than just a name.  Its written policy states that officers "can ask for

8    identification; however, a person is not required to provide government-issued ID.  If a person

9    only provides a name, officers may require additional personal identifying information such as

10   date of birth or social-security number in order to verify identity."[81]  Metro's "person most

11   knowledgeable" witness produced for deposition under Federal Rule of Civil Procedure 30(b)(6)

12

---

13   [79] *Terry v. Ohio*, 392 U.S. 1 (1968); *see also State v. Sonnenfeld*, 958 P.2d 1215, 1216 (Nev. 1998) (applying the reasonable-suspicion standard when analyzing a stop made under NRS 171.123).

14

15   [80] *See Hiibel v. Sixth Jud. Dist. Ct.*, 59 P.3d 1201 (Nev. 2002) (*Hiibel I*); *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177 (2004) (*Hiibel II*).

16   [81] ECF No. 121-1 at 7–8 (Metro's Procedural Order, PO-026-17) (cleaned up).  Patterson relies on a deposition of Kevin Baker, a Metro Fed. R. Civ. P. 30(b)(6) witness who sat for deposition in another case, *Matthews v. Las Vegas Metro. Police Dep't*, Case No. 18-cv-00231-RFB-DJA,
17   to contend that Metro has trained its officers that they can also demand a suspect's "phone number, tattoo information, or fingerprints for which they bring the suspect to jail to obtain."
18   ECF No. 121 at 7.  Metro contends that referring to a deposition from another case is prohibited here.  ECF No. 126 at 8–9.  Federal Rule of Civil Procedure 32(a)(8) states that "a deposition
19   lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or
20   successors in interest, to the same extent as if taken in the later action.  A deposition previously taken may also be used as allowed by the Federal Rules of Evidence."  This action does not
21   involve the same plaintiff as *Matthews*, and Patterson hasn't established that it involves the same subject matter.  Nor does he point to any Federal Rule of Evidence that permits him to use the
22   deposition testimony of a 30(b)(6) witness that Metro did not designate in this case.  So I decline to consider Baker's testimony, particularly since Metro designated a different witness here, and
23   he was deposed.  *See* ECF No. 135-8 (deposition of Lt. Landon Reyes, Metro's designated 30(b)(6) witness).

explained that the policy permits an officer to ask for additional identifying information if she "is not able to distinguish a person from other returns" in the police database.[82]  Patterson contends that this policy runs afoul of the *Hiibel* cases because it ignores the courts' narrow interpretation of NRS 171.123(3), violates privacy interests protected by the Fourth Amendment, and is void for vagueness under the Fourteenth Amendment's due-process clause.

### 1.    Metro's interpretation of NRS 171.123(3) does not violate the Fourth Amendment.

#### a.    The Hiibel cases do not definitively interpret NRS 171.123(3) to prohibit police officers from asking suspects for identifying information beyond a name.

Patterson argues that the *Hiibel* cases "set out a bright-line rule that NRS 171.123(3) only requires a suspect to disclose a name," so Metro's policy expanding that interpretation "exceeds [its] statutory authority."[83]  But Patterson's analysis mischaracterizes the holdings in those cases and overstates their reliance on the assumption that NRS 171.123(3) is satisfied if a suspect gives only his name.

The question in the *Hiibel* cases was whether arresting a suspect for refusing to provide an identifying document or his name during a valid *Terry* stop violates the Fourth Amendment. That's because those were the *Hiibel* facts.  An officer investigating a report of a man assaulting a woman in a red and silver GMC truck on a particular Nevada road came upon an intoxicated-looking Larry Hiibel standing by such a truck with a woman seated inside it and stopped on that same road.[84]  The officer asked Mr. Hiibel to produce "a driver's license or some other form of

---

[82] ECF No. 135-8 at 12 (22:16–21).

[83] ECF No. 145 at 20 (cleaned up); ECF No. 121 at 2.

[84] *Hiibel II*, 542 U.S. at 180–81.

written identification."[85]  Mr. Hiibel refused 11 times, saying he'd done nothing wrong, and he taunted the officer to arrest him and take him to jail.[86]  He got his wish and then challenged his obstruction charge, arguing that "the officer's conduct violated his Fourth Amendment rights."[87]

In rejecting Mr. Hiibel's challenge, the Nevada Supreme Court didn't definitively interpret NRS 171.123(3) to require only a name.  It instead analyzed the constitutionality of the law under the facts of the case presented, in which Hiibel refused to provide even his name to the arresting officer.  It concluded that complying with NRS 171.123(3) presented a minimal intrusion into the suspect's privacy because the statute does not require a suspect "to provide private details about his background, but merely to state his name to an officer when reasonable suspicion exists."[88]  When read in the context of the rest of the opinion, that statement does not purport to interpret NRS 171.123(3) as narrowly as Patterson does.  The Court was merely drawing a distinction between answering questions about a person's "private details" and answering questions about a person's identity.  Indeed, it wrapped up the opinion by concluding that "[r]equiring a person reasonably suspected of committing a crime to identify himself . . . to law enforcement officers during a brief, investigatory stop is a commonsense requirement necessary to protect both the public and law enforcement officers.  It follows that NRS 171.123(3) is good law consistent with the Fourth Amendment."[89]  Had the Nevada Supreme Court been presented with the details of Patterson's case instead, there's no indication in *Hiibel I*

---

[85] *Id*. at 181.

[86] *Id*.

[87] *Id*. at 185.

[88] *Hiibel I*, 59 P.3d at 1206.

[89] *Id*. at 1207.

18

1  that the Court would consider a birthdate or address to be a private detail about his background

2  as opposed to a non-intrusive identifying attribute.

3      Neither did the U.S. Supreme Court endeavor to create any bright-line rule about what

4  identifying questions an officer can ask during a *Terry* stop in *Hiibel II*. It instead accepted the

5  premise that NRS 171.123(3) "does not require a suspect to give the officer a driver's license or

6  any other document," and assumed that, if the suspect "either states his name or communicates it

7  to the officer by other means . . . the statute is satisfied and no violation occurs."[90] Under that

8  assumption, the Court held that the statute does not offend the Fourth Amendment because the

9  governmental interest in ascertaining identity during a *Terry* stop outweighs the minimal privacy

10  intrusion caused by doing so.[91] Nowhere in *Hiibel II* does the Court announce that an officer's

11  request for identifying information other than a name is a violation of the Fourth Amendment.

12  Nor does it hold that such a request would be beyond the scope of NRS 171.123(3).

13      In short, Patterson's argument that the *Hiibel* cases require Metro to interpret NRS

14  171.123(3) to permit arrest only when a suspect refuses to give his name is unpersuasive. As

15  relevant here, *Hiibel II*—the only *Hiibel* opinion that binds this court's Fourth Amendment

16  analysis—merely established that (1) officers may ask questions pertaining to a suspect's identity

17  during a *Terry* stop; and (2) officers may arrest a suspect for refusing to answer those questions

18  as long as the request for identification is "reasonably related to the circumstances justifying the

19  stop."[92] It does not require that officers restrict their questioning to only a name.[93]

20

---

21  [90] *Hiibel II*, 542 U.S. at 185.

   [91] *Id.* at 186–88.

22  [92] *Id.* at 188.

23  [93] Patterson also argues that Metro's policy flouts the Ninth Circuit's opinion in *United States v. Landeros*, 913 F.3d 862, 869 (9th Cir. 2019), in which the court discussed *Hiibel* briefly and noted that, "[a]s authoritatively interpreted by the Nevada Supreme Court, [NRS 171.123(3)]

   **b.**  ***The government's interest in learning identifying information about a suspect during a <u>Terry</u> stop outweighs the minimal intrusion into the suspect's privacy.***

  The extensive privacy-rights discussions in the *Hiibel* cases support the conclusion that an interpretation of NRS 171.123(3) that permits officers to obtain more than a name is also consistent with the Fourth Amendment.  A state law implicating a person's Fourth Amendment rights is consistent with those rights if it "properly balances the intrusion of the individual's interests against the promotion of legitimate government interests."[94]  When discussing the governmental interests that support NRS 171.123(3), both courts consistently conflated knowing a person's name with ascertaining his identity.  In *Hiibel I*, the Nevada Supreme Court stated that the statute requires a suspect "merely to state his name to an officer when reasonable suspicion exists" but reasoned that the government has in interest in "[k]nowing the identity of a suspect," including information about his criminal history, in order "to more accurately evaluate and predict potential dangers."[95]  In *Hiibel II*, the U.S. Supreme Court noted that "obtaining a suspect's name in the course of the *Terry* stop serves important government interests" because "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense or has a record of violence or mental disorder."[96]  And it explained that "[t]he principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop" because

---

required only that a suspect disclose [his] name—not produce a driver's license or any other document."  But that statement was dicta.  The *Landeros* court was concerned with an investigatory stop during which an officer demanded that a person produce identification, even though the officer lacked any reasonable suspicion that he had committed a crime.  *See id.* at 870.  It discussed Nevada's stop-and-identify law merely as part of its analysis of why *Hiibel* was factually distinguishable.  So I do not consider binding *Landeros*'s characterization of the Nevada Supreme Court's interpretation of NRS 171.123(3).

[94] *Hiibel II*, 542 U.S. at 178 (citation omitted).

[95] *Hiibel I*, 59 P.3d at 1205–06.

[96] *Hiibel II*, 542 U.S. at 186 (cleaned up).

1    "[t]he request for identity has an immediate relation to the purpose, rationale, and practical

2    demands of a *Terry* stop."[97]    The High Court also concluded that the state had an interest in its

3    ability to arrest a suspect for failing to respond to those requests, noting that "the threat of

4    criminal sanction helps ensure that the request for identity does not become a legal nullity."[98]

5         The *Hiibel* courts did not consider whether or how much more information beyond an ID

6    or a name an officer can demand during an investigatory stop because Mr. Hiibel wasn't asked

7    for more.  But the rationale in these cases suggests that it is constitutional to interpret NRS

8    171.123(3) to allow an officer to seek the amount of identifying information needed to match a

9    suspect to an entry in a police database in order to "assess the situation, [any] threat to [the

10   officer's] own safety, and possible danger" to potential victims or the public.[99]   The *Hiibel* courts

11   opined that officers have a valid interest in learning whether a suspect has outstanding warrants,

12   is a convicted felon, or has a mental disorder or history of violence[100] during a *Terry* stop—all

13   things that a name alone may not tell an officer if that person's name isn't unique enough to

14   permit the officer to find him in a police database.  This implies that to meet those governmental

15   interests, the officer must be able to positively identify a suspect through a records search and,

16   depending on the circumstances, the officer may reasonably require more than a name to ensure

17   that the right individual has been identified.

18

19   _____

20   [97] *Id.* at 187–88.

     [98] *Id.* at 188.

21   [99] *Id.* at 186.

22   [100] *Hiibel I*, 59 P.3d at 1205 (noting that "former felon[s]" or individuals "wanted for an
     outstanding arrest warrant . . . pose a heightened risk of danger to officers and the public during
23   investigatory encounters"); *Hiibel II*, 542 U.S. at 186 (noting that a suspect's identity "may
     inform an officer that a suspect is wanted for another offense, or has a record of violence or
     mental disorder").

The broader body of Fourth Amendment jurisprudence supports this reading.  The Supreme Court has long held that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."[101]  It has also explained that, "if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information."[102]  Never has the Supreme Court held that an officer's demand that a suspect identify himself must be limited only to a request for a person's name.  Much to the contrary, it has explained that "identity has never been considered limited to the name on the arrestee's birth certificate."[103]  The Court has even permitted officers "to determine a suspect's identity by compelling the suspect to submit to fingerprinting"—a far greater intrusion than the identification requests that Metro's policy permits—as long as there is "a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime.'"[104]

Patterson thus has not established that asking for identifying information beyond a name—such as a suspect's birthdate, social-security number, or address—so invades his Fourth Amendment privacy interests that doing so outweighs the government's valid interest in positively identifying a suspect in a manner that would allow officers to learn relevant information about him.  As long as the officer's requests are reasonably related to the

---

[101] *Adams v. Williams*, 407 U.S. 143, 146 (1972).

[102] *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (citing *United States v. Hensley*, 469 U.S. 221, 229, 232, 234 (1985); *United States v. Place*, 462 U.S. 696 (1983); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975)).

[103] *Maryland v. King*, 569 U.S. 435, 450 (2013) (discussing officers' ability to identify suspects after they have been arrested and brought to jail).

[104] *Id.* at 188–89 (quoting *Hayes*, 470 U.S. at 817).

circumstances of the stop and do not seek information unrelated to identifying the suspect, the Fourth Amendment doesn't appear to limit an officer's ability to seek more than just a name during a *Terry* stop and to arrest a suspect who fails to respond. So because ascertaining identity "has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop,"[105] Metro's policy permitting officers to seek information beyond a name—and to arrest suspects who refuse to comply—does not violate the Fourth Amendment.

### 2.    *Metro's policy isn't unconstitutionally vague.*

Patterson also claims that Metro's policy is unconstitutionally vague.[106] "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[107] When evaluating "a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered."[108]

---

[105] *Id.* at 187–88.

[106] ECF No. 121 at 19–22.

[107] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489 (1982); *Smith v. Goguen*, 415 U.S. 566 (1974); *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1926)).

[108] *Vill. of Hoffman Ests.*, 455 U.S. at 494. It's unclear whether a facial vagueness challenge, like the one Patterson mounts here, *see* ECF No. 121 at 21, is permissible. "Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). And even if a facial vagueness challenge is permitted, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 497; *see also Kolender*, 461 U.S. at 369–73 (J. White, dissenting). But because it appears that *Kolender* assessed a similar statute for vagueness without requiring the plaintiff to show that the law was vague in all applications, and because Metro doesn't contend that this analysis is impermissible, I proceed under the assumption that Patterson's facial challenge is permissible.

Patterson relies on *Kolender v. Lawson*, in which the U.S. Supreme Court struck down as unconstitutionally vague a California stop-and-identify law that required suspects to provide "credible and reliable" identification when an officer asked for it.[109]  Patterson likens Metro's policy permitting officers to seek additional information "in order to verify identity" to the "credible and reliable" language deemed unconstitutionally vague in *Kolender*.[110]  He contends that "under this policy there is no definiteness because the suspect is forced to continue giving identifying information until the officer is satisfied [she has] enough to confirm the suspect's identity," meaning that ordinary individuals "must trust the officer's discretion and cannot know in advance what information they might be required to provide" during a *Terry* stop.[111]

California's stop-and-identify law in *Kolender* required suspects to provide identification "carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself."[112]  The California state court had interpreted the "credible and reliable" language to require that the suspect "account for his presence to the extent that it assists in producing credible and reliable identification."[113]  But the Supreme Court held that this interpretation "contains no standard for determining what a suspect has to do in order to satisfy the requirement to provide credible and reliable identification" and, as such, "vests virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute . . . ."[114]  Because that construction "require[d] that 'suspicious'

---

[109] *See Kolender*, 461 U.S. at 361–62.

[110] ECF No. 121 at 20–21.

[111] *Id.*

[112] *Kolender*, 461 U.S. at 357.

[113] *Id.* 356–57 (cleaned up).

[114] *Id.* at 358.

persons satisfy some undefined identification requirement or face criminal punishment," the statute was void for vagueness.[115]

Metro's interpretation of NRS 171.123(3) to permit an officer to request the amount of information necessary to verify identity is materially distinguishable from the vague "credible and reliable" language struck down in *Kolender*. The United States Supreme Court has explained that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been provided; but rather the indeterminacy of precisely what that fact is."[116] While subjective terms, like "credible," "reliable," "annoying," or "indecent," without "statutory definitions, narrowing context, or settled legal meanings" may infuse a statute with impermissible indeterminacy,[117] a person of ordinary intelligence understands what information may serve to verify identity—namely, the things listed by Metro and relied upon by Salazar: birthdate, social-security number, address. The policy also specifies what a suspect is *not* required to provide: a government-issued ID.

Though Metro's interpretation allows some "flexibility and reasonable breadth, rather than meticulous specificity," limiting the types of information to that needed to verify identity using the officer's computer database puts concrete boundaries around what the statute as a whole permits.[118] Metro's records database contains a finite set of information for an officer to check a suspect's identity against.[119] This includes visual indicators (i.e., gender, height, tattoos,

---

[115] *Id.* at 361 (cleaned up).

[116] *United States v. Williams*, 553 U.S. 285, 306 (2008).

[117] *Id.*

[118] *Id. See also Hiibel II*, 542 U.S. at 184 (noting that NRS 171.123(3) "is narrower and more precise" than the statute at issue in *Kolender*).

[119] *See* ECF No. 135-8 at 9–12 (Deposition of Metro's Fed. R. Civ. P. 30(b)(6) witness, describing identifying information in the police database that officers can use to identify suspects).

relative age) that officers may simply use their eyes to gather, allowing them to confirm identity

with just a modicum of information.  And other identifiers like name, birthdate, social-security

number, and address are all discrete, additional pieces of information that an officer might seek

from a suspect to verify that the record that results from a search matches the person being

investigated.  So unlike the statute in *Kolender*, which put no boundaries on the information that

police could demand, Metro's policy cabins officers to seeking "personally identifying

information" that can be found in the officer's computer database.  Metro's interpretation of

NRS 171.123(3) is thus not impermissibly vague.[120]

**C.     Because Metro's policy is constitutional, the City of Las Vegas is entitled to summary judgment on Patterson's request for injunctive relief.**

Patterson's claims against the City of Las Vegas hinge on his allegation that the City

engaged in "malicious prosecution . . . despite the absence of any lawful basis for

prosecution."[121]  He moves for summary judgment against the City on "the discrete legal issue"

of whether NRS 171.123(3) requires a suspect to give an officer more than a name, and he seeks

injunctive relief prohibiting the City from any future prosecutions based on violations of NRS

---

[120] Patterson half-heartedly argues that Metro's policy is unconstitutional for the additional reason that it violates the Fifth Amendment's protections against self-incrimination.  He grounds this argument in a Metro witness's testimony stating that one reason officers ask for additional identifying information is because "a lot of people . . . lie" to the police.  ECF No. 145 at 24 (quoting ECF No. 137-9 at 11 (22:3–6)).  Patterson contends that this witness essentially admitted that officers are hoping to "catch suspects in a lie, which is a crime," so the officers are "specifically attempting to extract incriminating information."  *Id.*  That contention relies on an unreasonably strained reading of this witness's testimony, which merely suggested that officers may be required to ask for information beyond a name to confirm that suspects are who they say they are.  As the United States Supreme Court noted in *Hiibel II*, "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense" and, in that case, a court may have the occasion to "consider whether the privilege applies and, if the Fifth Amendment has been violated, what remedy must follow."  *Hiibel II*, 542 U.S. at 191.  This isn't that case.

[121] ECF No. 1 at 10, ¶¶ 72–75.

1   171.123(3) "if [] Patterson identifies himself to the police in a reasonable suspicion stop by

2   stating his full name, and refuses to give additional identifying information . . . ."[122]  The City

3   countermoves for summary judgment in its favor, arguing that Patterson doesn't have any active

4   claims against the City, Metro's policy is constitutional, and the broad injunctive relief he seeks

5   is unavailable.

6        Because I find that Metro's policy is constitutional,[123] Patterson's claims against the City

7   fail and the relief he seeks is unavailable.  Metro officers may seek necessary identifying

8   information beyond a name under the Fourth Amendment.  So injunctive relief prohibiting the

9   City from prosecuting Patterson if he refuses to provide more than his name during a future

10  *Terry* stop—the only relief Patterson seeks from the City—is not available.  I thus grant the City

11  summary judgment on Patterson's claims against it.

12  **D.    Factual disputes preclude summary judgment on whether Salazar unlawfully
        arrested Patterson for a traffic violation, but Salazar is entitled to qualified
13      immunity on Patterson's theory that his arrest for obstruction was unlawful.**

14       Even though Metro's policy doesn't violate the U.S. Constitution, Salazar's detention,

15  frisk, and arrest on April 14, 2021, still might.  Patterson contends that Salazar unlawfully

16  arrested him in violation of the Fourth Amendment because she lacked probable cause to arrest

17  him for obstruction after he identified himself to the extent required under NRS 171.123(3).[124]

18  Salazar responds that she had probable cause to arrest him for obstruction—but also that she had

19  probable cause to arrest him for traffic violations, and because any probable cause known to an

20

---

21  [122] ECF No. 119 at 3.  The City contends that Patterson's complaint contains no constitutional
22  claims against it, so there is no active controversy between the parties.  I do not address this issue
    because Patterson admittedly seeks only injunctive relief from future prosecution from the City
    and, no matter what substantive claim underlies that request, it fails.

23  [123] *See supra* at 15–26.

    [124] ECF No. 137 at 22–24.

1  arresting officer can support an arrest, a finding of probable cause for either crime defeats

2  Patterson's unlawful-arrest claim.[125]

3  "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth

4  Amendment, provided the arrest was without probable cause or other justification."[126]  "Probable

5  cause exists when, under the totality of the circumstances known to the arresting officer[] . . . , a

6  prudent person would believe [that] the suspect had committed a crime."[127]  "[T]he existence of

7  probable cause is not [determined by an analysis] of [the] subjective certainty of the arresting

8  officer, but by an objective standard of reasonableness."[128]  "Whether probable cause exists

9  depends upon the reasonable conclusion to be drawn from the facts known to the arresting

10 officer at the time of the arrest."[129]  And "[b]ecause probable cause is an objective standard, an

11 arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense

12 cited at the time of arrest or booking."[130]

13  **1.    *Whether Maglich told Salazar that Patterson ran a stop sign is a disputed fact***

14  ***that must be resolved to determine whether Salazar had probable cause to arrest Patterson for a traffic violation.***

15  Salazar contends that she cannot be held liable for unlawful arrest because she had

16 probable cause to arrest Patterson for running a stop sign.[131]  Salazar didn't personally witness

---

[125] ECF No. 135 at 8–17.

[126] *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012)).

[127] *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001) (citing *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)).

[128] *Smith v. United States*, 402 F.2d 771, 772 (9th Cir. 1968) (citing *Brinegar v. United States*, 338 U.S. 160 (1949)).

[129] *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

[130] *District of Columbia v. Wesby*, 583 U.S. 48, 54 n.2 (2018) (citing *Devenpeck*, 543 U.S. at 153–55).

[131] ECF No. 135 at 10–11.

1  Patterson commit a traffic violation; she contends that Officer Maglich did, however, and that

2  she obtained probable cause when Maglich told her what he saw.[132]  She relies on the collective-

3  knowledge doctrine to contend that Maglich's knowledge can be imputed to her.[133]  But the

4  collective-knowledge doctrine typically applies when the arresting officer is never given the

5  information that supports probable cause, and that's not what Salazar is saying happened here.[134]

6  She elsewhere implies that she had probable cause to arrest Patterson when she frisked and

7  handcuffed him—both events that occurred *before* Maglich allegedly told her that Patterson ran a

8  stop sign.  So I address the collective-knowledge doctrine only to clarify that, to the extent there

9  may have been probable cause to arrest Patterson at one point, that point was the moment

10  Maglich allegedly gave Salazar information establishing probable cause, and not a moment

11  sooner.

12   ***a.   The collective-knowledge doctrine does not supply the probable cause***
   ***needed to arrest before Maglich allegedly told Salazar that he witnessed***
13   ***Patterson run a stop sign.***

14      "Under the collective[-]knowledge doctrine, [courts] must determine whether an

15  investigatory stop, search, or arrest complied with the Fourth Amendment by 'looking to the

16  collective knowledge of all of the officers involved in the criminal investigation although all of

17  the information known to the law enforcement officers involved in the investigation is not

18  communicated to the officer who actually undertakes the challenged action.'"[135]  The Ninth

---

19

20  [132] *Id.*

   [133] *Id.*

21  [134] To the extent that Salazar is trying to overcome a state-law prohibition on misdemeanor
   arrests if the arresting officer didn't personally witness the offense, *see id.* (citing NRS 171.136),
22  that theory fails because state law doesn't dictate what the Fourth Amendment permits.  *See infra*
   at 34–35.

23  [135] *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (quoting *United States v.
   Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986)) (cleaned up).

Circuit has applied the doctrine in two situations: (1) when "law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned," or (2) when an officer "with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause[] directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest."[136]

> ### i.    Law-enforcement officers were not working together here.

The Ninth Circuit cases applying the collective-knowledge doctrine in the first scenario emphasize that the court is "willing to aggregate the facts known to each of the officers involved at least 'when there has been communication among agents.'"[137]  "[T]he purpose to be served by [the] requirement of communication among the officers is simply to 'distinguish officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject.'"[138]

A review of the cases applying this first branch of the collective-knowledge doctrine shows that the situation presented here is not what the Ninth Circuit had in mind when permitting collective knowledge to supply probable cause.  In *United States v. Bernard*, for example, the court found probable cause based on the collective knowledge of several officers who were "working in close concert with each other" on an investigation into an individual suspected of manufacturing methamphetamine.[139]  In *United States v. Del Vizo*, several officers were again involved in an investigation about illegal drug activity at a specific residence.[140]  The court

---

[136] *Id.*

[137] *Id.* (quoting *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990)).

[138] *Id.* (quoting *United States v. Terry*, 400 F.3d 575, 581 (8th Cir. 2005)).

[139] *United States v. Bernard*, 623 F.2d 551, 553, 561 (9th Cir. 1979).

[140] *Del Vizo*, 918 F.2d at 826.

concluded that probable cause to arrest suspects at the residence existed based on "the wealth of information gathered" by the officers investigating their conduct, all of which was considered under the collective-knowledge doctrine.[141]  Lastly, in *United States v. Sandoval-Venegas*, the court applied the collective-knowledge doctrine to find probable cause when two detectives investigating the same suspect were communicating about that investigation before making the arrest.[142]

Nothing in this case law supports the notion that the doctrine should apply here.  The record does not indicate that Officers Salazar and Maglich were functioning as a team to investigate Patterson.  Rather, all officers on duty in the downtown area that night were under a blanket order to cite everyone riding a bike for traffic violations.  Before Maglich allegedly told Salazar that Patterson ran a stop sign, the extent of their communication was Maglich radioing out a general request for backup from any available unit because some cyclists were still in the area.  Maglich and Salazar weren't even investigating the same suspect: Maglich was citing another cyclist and never indicated that he was also planning to investigate Patterson.  So this record supports just one conclusion: Maglich and Salazar were independently investigating different suspects for violating traffic laws.

ii.     *No officer with probable cause directed Patterson's stop or arrest.*

The second permissible application of the collective-knowledge doctrine—that an officer with knowledge amounting to probable cause directed another officer to stop or arrest a suspect—also doesn't apply here.  Maglich did not direct Salazar to arrest Patterson; he radioed out a broad request for backup.  Salazar's initial decision to stop and investigate Patterson was of

---

[141] *Id.*

[142] *United States v. Sandoval-Venegas*, 292 F.3d 1101, 1105 (9th Cir. 2002).

her own volition and based on a generalized report that everyone on a bike that night was violating traffic laws.  So Salazar can't rely on the collective-knowledge doctrine to contend that she had probable cause to arrest Patterson based on Maglich's knowledge.

### b.    Whether Salazar had probable cause based on Maglich's communication that Patterson ran a stop sign, however, is disputed.

Even without the collective-knowledge doctrine, however, it may be the case that Maglich eventually communicated information that would have given Salazar probable cause to arrest Patterson after she received that information.  At that point, the information Salazar knew at the time would have included Maglich's statement that he witnessed Patterson run a stop sign.[143]  Whether Maglich personally observed Patterson's traffic violation and told Salazar about it, however, is genuinely disputed.

Maglich and Salazar certainly spoke about Patterson.  The body-cam footage shows that, after handcuffing Patterson, Salazar walked over to Maglich's car and asked, "Was he also part of the group?"  Maglich responded, "Oh yeah," then both officers turned their body-cams off.  At his deposition, Maglich testified that, while those cameras were off, he told Salazar that Patterson ran a stop sign and indicated that Patterson was part of the group of cyclists he was following earlier.[144]

But the circumstances caught on camera after that cast doubt on Maglich's story. Maglich's body-cam was off for just 26 seconds, and when it came back online, it captured Maglich speaking with the cyclist he pulled over.  Maglich pointed toward Patterson and Salazar

---

[143] *See Devenpeck*, 543 U.S. at 152; *United States v. Butler*, 74 F.3d 916, 920 (9th Cir. 1996) (noting that probable cause can be "based on information relayed to [an arresting officer] through official police channels" (citation omitted)).

[144] ECF No. 137-23 at 29 (100:5–19).

1    and commented, "I don't know what's going on over there, I'm confused, so, I have no idea."[145]

2    A couple minutes later, he asked his suspect—whom he cited for failing to have a taillight, not

3    running a stop sign—if he was waiting for Patterson, and the suspect responded that he didn't

4    know Patterson.[146]  Salazar then called Maglich over, and Maglich told Salazar that his suspect

5    said that Patterson "wasn't even with them" and asked Salazar, "is that him?"[147]  At her

6    deposition, Salazar couldn't recall any specific information that Maglich told her while their

7    cameras were off, and at no point did she tell Patterson, or report on her declaration of arrest, that

8    he was arrested specifically for running a stop sign.  She instead repeated that Patterson was

9    being arrested for "violating all traffic laws."[148]

10          This record leaves a genuine question of fact regarding whether Maglich actually told

11    Salazar that he saw Patterson run a stop sign in that brief window when the cameras were off.

12    It's entirely possible to infer from these facts that Maglich merely confirmed that Patterson was

13    with the group of cyclists he saw earlier but didn't confirm that he saw Patterson commit a

14    specific traffic violation.  Based on how he referred to Patterson during the night in question, it's

15    unclear if Maglich recognized Patterson at all.  At the time, Maglich didn't mention a stop-sign

16    violation.  The fact that he cited his suspect for failing to have a taillight instead of also running a

17    stop sign could circumstantially support a finding that Maglich did not register the fact that the

18    group ran a stop sign until after reviewing video evidence from that night.  Indeed, the first time

19    Maglich stated that he witnessed Patterson and his suspect run a stop sign was at his deposition

20    in this case, after he admittedly watched Patterson's GoPro video showing Patterson's traffic

---

21

22    [145] Maglich's body-cam footage, at T03:34:46:50Z.

      [146] *Id.* at 3:35:44–53.

23    [147] *Id.* at 3:36:25–35.

      [148] ECF No. 137-1.

1    violation.  So whether Maglich gave Salazar the requisite knowledge to support a finding of

2    probable cause that Patterson committed a traffic violation is a determination that a jury must

3    make after viewing all the evidence and assessing Maglich and Salazar's credibility.[149]

4

5                    **c.    *Patterson's state-law arguments concerning Maglich's observations
                            aren't relevant to this Fourth Amendment analysis.***

6           Patterson contends that even if Maglich did see him run a stop sign, that fact "is

7    irrelevant" because Patterson's arrest for a misdemeanor traffic violation was barred by case law

8    and NRS 171.136(2), which prohibits misdemeanor arrests between the hours of 7 p.m. and

9    7 a.m. unless (among other things) the arresting officer witnessed the offense.[150]  He first notes

10   that the Nevada Supreme Court held in *State v. Bayard* that an officer violates the state

11   equivalent of the Fourth Amendment when she unreasonably "makes a full custodial arrest

12   instead of issuing a traffic citation."[151]  But *Bayard* is inapposite in this federal constitutional

13   context.  The United States Supreme Court held in *Atwater v. Lago Vista* that "[i]f an officer has

14   probable cause to believe that an individual has committed even a very minor criminal offense in

15   his presence he may, without violating the Fourth Amendment, arrest the offender."[152]  The

16   Nevada Supreme Court acknowledged *Atwater* in its *Bayard* decision and confirmed that

17   Nevada's constitutional protections exceed the Fourth Amendment's protections concerning

18   _____

19   [149] To the extent that Salazar invokes a qualified-immunity defense for this probable-cause
     determination, questions of fact preclude application of the defense at this time.  If a jury
20   concludes that Salazar never received information establishing probable cause for a traffic-
     violation offense, it's likely that the arrest could have violated clearly established law.  Salazar
21   doesn't specifically argue that it wouldn't: her qualified-immunity analyses focus specifically on
     the claims that she unconstitutionally frisked Patterson and arrested him for obstruction.  *See*
22   ECF No. 135 at 17–18; ECF No. 143 at 11.

     [150] ECF No. 137 at 25–26.

23   [151] *State v. Bayard*, 71 P.3d 498, 502 (Nev. 2003).

     [152] *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001).

                                                    34

misdemeanor arrests.[153]  So *Bayard* is not dispositive of whether Patterson's arrest violated the Fourth Amendment.

Nor does it matter that Salazar's arrest might have violated NRS 171.136(2).  The United States Supreme Court has made clear that, "while [s]tates are free to regulate . . . arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."[154]  The Ninth Circuit has also rejected the argument that Patterson raises here.  In *Barry v. Fowler*, the plaintiff argued that her arrest for a misdemeanor violated the Fourth Amendment because the arresting officer didn't see her committing the offense, so the arrest was prohibited by a California law similar to NRS 171.136(2).[155]  The court disagreed, reasoning that "[t]he requirement that a misdemeanor must have occurred in the officer's presence to justify a warrantless arrest is not grounded in the Fourth Amendment."[156]  As explained in *Vanegas v. City of Pasadena*, another binding Ninth Circuit case on this issue, "to establish a violation of the Fourth Amendment, it does not matter if [the officer] was present when the [suspect] committed the misdemeanor."[157]  The "crucial inquiry" is instead whether the officer "had probable cause to make the arrest" under federal law.[158]

### 2.    *Although the obstruction arrest was unlawful, Salazar is entitled to qualified immunity because the arrest didn't violate clearly established Fourth Amendment law.*

Salazar contends that even if she lacked probable cause to arrest Patterson for running a stop sign, the arrest was lawful because she separately had probable cause to arrest him for

---

[153] *Bayard*, 71 P.3d at 501–03.  I analyze Patterson's state constitutional claim *infra* at 42–44.

[154] *Virginia v. Moore*, 553 U.S. 164, 176 (2008).

[155] *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990).

[156] *Id.*

[157] *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1165 (9th Cir. 2022).

[158] *Id.* (quoting *Fowler*, 902 F.2d at 773).

1  obstruction when he didn't identify himself to her satisfaction.[159]  Patterson moves for summary

2  judgment on this point too, arguing that Salazar's inability to identify him with his full name and

3  birthdate was objectively unreasonable under the totality of the circumstances.[160]  Salazar

4  counters that she is entitled to qualified immunity from Patterson's Fourth Amendment claim for

5  the obstruction arrest.

6      The qualified-immunity doctrine protects government officials "from money damages

7  unless a plaintiff [shows] that (1) the official violated a statutory or constitutional right and

8  (2) the right was 'clearly established' at the time of the challenged conduct."[161]  The plaintiff

9  bears the burden of showing that the right at issue was clearly established and that the law

10  "clearly prohibit[ed] the officer's conduct in the particular circumstances before [her]."[162]

11  Although the plaintiff need not identify a case "directly on point, existing precedent must have

12  placed the statutory or constitutional question beyond debate."[163]

13           ***a.    Salazar lacked probable cause to arrest Patterson for obstruction.***

14      To show that probable cause supported Salazar's obstruction arrest, she must demonstrate

15  that an objectively reasonable, prudent person[164] would believe that Patterson had committed a

16  crime when he refused to continue providing identifying details about himself.  But no prudent

17  person would believe that Patterson didn't comply with NRS 171.123(3) or that Salazar's

18  identification requests were related to the circumstances surrounding the stop.  There is no

---

19  [159] *See Wesby*, 583 U.S. at 54 n.2 (holding that an arrest remains lawful if the officer has
   probable cause for any crime, even if it's not the crime the suspect was arrested for).

20  [160] ECF No. 137 at 23–24.

21  [161] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800,
   818, (1982)) (cleaned up).

22  [162] *Wesby*, 583 U.S. at 63.

23  [163] *Robinson v. York*, 566 F.3d 817, 826 (9th Cir. 2009).

   [164] *See Dubner*, 266 F.3d at 966; *Smith*, 402 F.2d at 772.

dispute that Patterson gave Salazar his full name and birthdate, and Salazar admits that she was able to narrow the SCOPE database results down to three hits. One was a female born 20 years before Patterson, and the other two (Kelly W. Patterson and Kelly Wayne Patterson) shared a social-security number, birthdate, sex, height, weight, and hair and eye color. Any reasonable person could deduce that the bicycling Kelly Wayne Patterson detained that night was not a 72-year-old woman and that the two remaining possible entries were duplicates of each other. So no prudent person could have concluded that Patterson's refusal to answer further questions ran afoul of NRS 171.123(3) or obstructed Salazar's investigation.

Salazar's primary argument to the contrary is simply ridiculous. She contends that she couldn't rule out the 72-year-old female entry based on her own personal observations of Patterson—a person who, based on the video footage showing his chest-length ZZ Top-style beard and large frame, overwhelmingly had characteristics consistent with a man in his fifties.[165] She "rejects [Patterson's] archaic examples of what it means to be a man or woman" and moralizes that "society has far surpassed this narrow view of gender" based on the external characteristics of a person.[166]

But the attempts to justify Salazar's identification demands on this basis don't just strain credulity, they're inconsistent with the record. In her declaration of arrest, Salazar identified Patterson as a "white male adult,"[167] and the record contains no indication that Salazar struggled

---

[165] *See* Salazar's body-cam footage, T03:30:04Z–T03:33:28Z. Salazar doesn't address the duplicate-entries issue in her briefs, but a review of her deposition testimony—in which she refuses to acknowledge that an obvious hallmark of social-security numbers is that they are unique identifiers that no two individuals share—shows that her belief that these two entries may not have been duplicates was not reasonable or prudent. *See* ECF No. 137-3 at 69 (257:1–260:26), 73 (265:1–266:21).

[166] ECF No. 143 at 7.

[167] ECF No. 137-1.

to guess Patterson's gender identity or that she believed he may present as a gender inconsistent with his physical characteristics. Indeed, she repeatedly referred to him as "Sir" and "Mr. Patterson" throughout the encounter.[168] More to the point, there's nothing in the record to show that Salazar reasonably believed based on any articulable facts that the cyclist before her may be a 72-year-old female instead of the matching SCOPE entry for a male with Patterson's first, middle, and last name and birthdate. So Salazar's conclusion that she couldn't identify Patterson on the information he had provided such that he had obstructed her investigation was objectively unreasonable.

Even if Salazar realistically needed more information to identify Patterson, the obstruction arrest was unlawful because her additional demands were beyond the needs of the stop. The Supreme Court has held that "an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop."[169] Salazar has not explained how the request was reasonably related to giving a citation for a cycling traffic violation. The High Court has distinguished a proper request for identification with an officer's unreasonable "effort to obtain an arrest for failure to identify after a *Terry* stop yielded insufficient evidence."[170] On this record, it's entirely likely that Salazar's obstruction arrest was just that: an arrest based on frustration that a suspect challenged her actions when nothing else otherwise justified the arrest. Either way, Salazar's arrest wasn't lawful.

---

[168] *See supra* at 7–8.

[169] *Hiibel II*, 542 U.S. at 188.

[170] *Id.* at 189.

1

2

        **b.**     ***The case law and statutory authority Salazar relies on to support a probable-cause determination is unavailing.***

3      Salazar cites *Tsao v. Desert Palace*[171] and *Andreaccio v. Weaver*[172] to support her

4  argument that requesting more information was legal.  But these two cases are materially

5  distinguishable.  In *Tsao*, the plaintiff intentionally gave officers who were investigating her for

6  trespass at a casino a version of her name that she knew would delay their ability to identify her

7  as a person who had previously been ejected.[173]  The Ninth Circuit held that the officers had

8  probable cause to arrest Tsao for obstruction based on her failure to identify herself under NRS

9  171.123(3) because she impeded "her arrest for trespass for some time," given the "disconnect

10  between Tsao's insistence that her name was Chang and the records associated with her license

11  plate" and social-security numbers.[174]  But here, Patterson was not willfully delaying Salazar's

12  investigation of any particular crime, nor did he give any false information; he merely refused

13  Salazar's unreasonable request that he provide information beyond that necessary to match him

14  to an entry in the database.  *Tsao* is inapposite.

15      So is *Andreaccio*.  Motorist Andreaccio argued that an officer's demand for identification

16  during a traffic stop violated his rights.[175]  I held that the officer was permitted to ascertain

17  Andreaccio's identity under NRS 171.123(3) because the officer had probable cause to believe

18  that Andreaccio had committed a crime.[176]  But that case did not present the issue identified here:

19

20  ——————————————
[171] *Tsao v. Desert Palace*, 698 F.3d 1128 (9th Cir. 2012).

21  [172] *Andreaccio v. Weaver*, 674 F. Supp. 3d 1011 (D. Nev. 2023).

    [173] *Tsao*, 698 F.3d at 1147.

22  [174] *Id.*

23  [175] *Andreaccio*, 674 F. Supp. 3d at 1027.

    [176] *Id.* at 1027–28.

1  whether a person can be arrested for obstruction when he provided sufficient identifying

2  information to permit the officer to identify him in the law-enforcement database.

3       Salazar also argues that Patterson's failure to offer up his driver's license independently

4  supported her arrest. She gets there through the roundabout syllogism that people riding bicycles

5  are subject to all laws applicable to people driving cars, drivers must provide their ID when

6  stopped, so Patterson's failure to provide his is a separate reason her arrest was legal.[177]  Salazar

7  doesn't identify which provision of the Nevada code requires drivers to provide "identification."

8  The only one this court can find is NRS 483.350, located in the section titled "Drivers' Licenses;

9  Driving Schools; and Driving Instructors," which says that "[e]very licensee shall have his or her

10  driver's license in his or her immediate possession at all times when driving a motor vehicle and

11  shall manually surrender the license for examination, upon demand," by a police officer.[178]

12  Salazar provides no support for the notion that a cyclist needs a driver's license or identification

13  card to ride a bicycle in this state.[179]  She relies on NRS 484B.763, which states that "[e]very

14  person riding a bicycle . . . upon a roadway has all of the rights and is subject to all the duties

15  applicable to the driver of a vehicle . . . except as to those provisions of chapters 484A to 484E,

16  inclusive, of NRS which by their nature can have no application."[180]  Even if this statute could be

17  interpreted to require a bicyclist to "surrender" identification "for examination upon demand," it

18  still wouldn't apply here because Salazar didn't make that demand. She only asked at the

19  _____

20  [177] ECF No. 135 at 17.

    [178] Nev. Rev. Stat. § 483.350.

21  [179] Under Nevada's definition of motor vehicle, it appears that this law wouldn't apply to
    bicycles. *See* Nev. Rev. Stat. § 483.090 ("'Motor vehicle' means every vehicle [that] is self-

22  propelled, and every vehicle [that] is propelled by electric power obtained from overhead trolley
    wires but not operated upon rails. 'Motor vehicle' includes a moped. The term does not include

23  an electric bicycle or an electric scooter, as defined in NRS 482.0295.").

    [180] Nev. Rev. Stat. § 484B.763.

                                    40

1  beginning of the encounter if Patterson "happen[ed] to have an ID" on him, and she dropped any

2  request to see ID when Patterson gave his name instead.  So Salazar has not established that she

3  could have required Patterson to present his identification during this stop, let alone that his

4  failure to do so without demand justified this Fourth Amendment intrusion.

5              **c.    *Even though the obstruction arrest wasn't supported by probable cause,***

6  ***Salazar is entitled to qualified immunity from this portion of Patterson's***
   ***unlawful-arrest claim because she didn't violate clearly established law.***

7              Even though Salazar lacked probable cause to arrest Patterson for obstruction, she is

8  entitled to qualified immunity from that portion of his unlawful-arrest because the arrest didn't

9  violate clearly established law.  Read liberally, Patterson's theory is that the United States in

10  *Hiibel II* definitively interpreted NRS 171.123(3) to require a suspect to provide only a name

11  when an officer requests identifying information, so Salazar's arrest after Patterson provided that

12  information violates clearly established law.  But as discussed *supra*, the *Hiibel* cases don't stand

13  for that limiting proposition.[181]

14              Patterson offers no case that holds that an officer violates the Fourth Amendment when

15  she arrests a suspect who provides his name but refuses to provide additional information to her

16  (unreasonable) satisfaction.  The case that comes closest is *United States v. Landeros*, in which

17  an officer arrested a passenger for failing to provide his identification during a traffic stop.[182]

18  The Ninth Circuit held that the arrest was unconstitutional because the officer lacked reasonable

19  suspicion to detain the passenger when he demanded identification.[183]  But Patterson concedes

20  that Salazar had a reasonable suspicion that he had violated traffic laws, so *Landeros* doesn't

21  apply to the instant facts.  Because Patterson hasn't met his burden to show that Salazar's

22  ───────────────
   [181] *See supra* at 15–23.

23  [182] *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019).

   [183] *Id.* at 870.

1    obstruction arrest violated clearly established law, Salazar is entitled to qualified immunity on

2    this theory of his unlawful-arrest claim.

3    **E.     Metro is entitled to summary judgment on Patterson's *Monell* claim against it because its policy was not deliberately indifferent to Patterson's rights or the moving force behind Salazar's unconstitutional actions.**

4

5        Patterson sues Metro under a *Monell* theory of liability, arguing that the department's

6    interpretation of NRS 171.123(3) was the reason Salazar unlawfully arrested him for failing to

7    identify himself to her satisfaction.[184]  To hold Metro liable for a constitutional violation under

8    *Monell*, Patterson must establish that Metro had a policy, custom, or practice that "amounts to

9    deliberate indifference to [Patterson's] constitutional right" and that it was "the moving force

10   behind the [officer's] constitutional violation."[185]  The parties do not dispute that Metro's

11   interpretation of NRS 171.123(3) constitutes an official policy.  The remaining elements,

12   however, are disputed.

13       Metro's policy was not deliberately indifferent to Patterson's rights or the moving force

14   behind Salazar's violation of those rights.  The policy itself does not violate the Fourth

15   Amendment because it properly weighs the government's interests in identifying a suspect with

16   an individual's privacy interests.  As explained *supra*, instructing officers that they may ask for

17   information like a date of birth or social-security number does not amount to deliberate

18   indifference to a suspect's rights.  Officers can indeed ask for that information without running

19   afoul of the Fourth Amendment.[186]  Had Salazar complied with Metro's policy and stopped

20   asking for more information after Patterson gave his full name and birthdate, thereby giving

21   Salazar all she needed to match Patterson with a hit in the SCOPE database as the statute

22   ───────────────
[184] ECF No. 121 at 23–27.

23   [185] *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

[186] *See supra* at 15–23.

1  contemplates, Salazar wouldn't have violated the Fourth Amendment.  It was her unreasonable

2  follow-ups, not Metro's policy, that caused her to step over the Fourth Amendment line.  In

3  effect, Salazar violated Metro's constitutional policy by seeking information even after satisfying

4  its limiting principles.  So I find that Metro is entitled to summary judgment on Patterson's

5  *Monell* claim.

6  **F.    The obstruction and traffic-violation arrests violated the Nevada Constitution.**

7        Patterson claims that Salazar's actions, "including detaining and arresting [him] without

8  reasonable suspicion or probable cause, demanding additional identification information beyond

9  what was required by Nevada law, and causing [his] prosecution for failing to identify himself"

10 also violated Article 1, Section 18 of the Nevada Constitution, which is Nevada's state corollary

11 to the Fourth Amendment.[187]  The Nevada Constitution provides greater protection from arrests

12 for misdemeanor traffic violations than the Fourth Amendment does.  While federal law allows

13 an officer to arrest a suspect as long as he has probable cause to believe that the suspect

14 committed a crime, regardless of how minor that crime is, Nevada law is more limiting.  In *State*

15 *v. Bayard*, the Nevada Supreme Court held instead that, "absent special circumstances requiring

16 immediate arrest, individuals should not be made to endure the humiliation of arrest and

17 detention when a citation will satisfy the state's interest."[188]  Those special circumstances can

18 either be provided via statute (specifically, the standards set for permissible arrest for a traffic

19 violation under NRS 484A.710–730) or "when an officer has probable cause to believe [that]

20 other criminal misconduct is afoot."[189]

21

22 _____

[187] ECF No. 1 at 8.

23 [188] *Bayard*, 71 P.3d at 502.

[189] *Id.*

The only "special circumstance" Salazar identifies to justify her arrest is Patterson's alleged failure to identify himself, which she argues permits an arrest under NRS 171.1771, which allows a misdemeanor arrest if "[t]he person does not furnish satisfactory evidence of identity" or the officer "has reasonable grounds to believe that . . . [t]he person will disregard a written promise to appear in court."[190]  Patterson argues that NRS 171.1771 doesn't apply to a traffic-violation arrest because Nevada has other laws that more specifically address when such an arrest may be made.[191]  For instance, NRS 484A.720 applies to arrests for violations of the state's traffic laws and requires that a suspect "halted by a peace officer for any violation of chapters 484A to 484E" be brought before a magistrate only when "the person demands an immediate appearance before a magistrate[,] . . . the person does not furnish satisfactory evidence of identity[,] or . . . when the person is issued a traffic citation and refuses to sign or take physical delivery of a copy of the traffic citation."[192]  Because Patterson was arrested for violating a traffic law (NRS 484B.763), NRS 484A.720's standard applies.  And as discussed *supra*, Patterson provided satisfactory information of his identity.[193]  So Salazar has not established any special circumstance justifying Patterson's arrest under Nevada law.

Because no special circumstance supported Patterson's arrest, I conclude that Salazar's traffic-violation arrest of Patterson violated Article 1, Section 18 of the Nevada Constitution. For the same reasons that I held that Salazar's conduct violated the Fourth Amendment,[194] I find that Salazar violated the Nevada Constitution when arresting Patterson for obstruction.  And

---

[190] Nev. Rev. Stat. § 171.1771(2).

[191] ECF No. 149 at 14.

[192] Nev. Rev. Stat. § 484A.720.

[193] *See supra* at 36–41.

[194] *Id.*

1   "qualified immunity, as that doctrine is understood under federal law, is not a defense available

2   to state actors sued for violations of the individual rights enumerated in Nevada's

3   Constitution."[195]  Patterson is therefore entitled to summary judgment in his favor as to Salazar's

4   liability for his claim that all aspects of his arrest violated the Nevada constitution.

5

6   **G.    Patterson is entitled to summary judgment on his federal unlawful-search and
        unlawful-seizure claims because Salazar frisked and handcuffed him without a
        reasonable belief that he was armed, dangerous, or violent, but qualified immunity
7       precludes liability on his related excessive-force claim.**

8       Officer Salazar frisked Patterson for weapons within 90 seconds of engaging with him

9   and handcuffed him immediately after that search.  Patterson claims that the search and seizure

10  violated his Fourth Amendment rights, plus he asserts claims for excessive force and battery for

11  the handcuffing.[196]  Patterson seeks summary judgment on his unlawful search and seizure

12  claims, but not on his excessive-force or battery claim.  Salazar moves for summary judgment on

13  all of those claims, arguing that the frisk was permissible because she had a reasonable belief

14  that Patterson may be armed and that the handcuffing was legal because she believed it was "a

15  necessary precaution to ensure" her safety and the safety of others.[197]  She also contends that,

16  because Patterson hasn't shown that he suffered injuries from the force used to handcuff him, his

17  excessive-force and battery claims fail.  Salazar doesn't clearly invoke qualified immunity on

18  Patterson's unreasonable-seizure claim related to the handcuffs, but she argues that she is entitled

19  to qualified immunity from his unlawful-search and excessive-force claims.

20

21

22  ───────────────
    [195] *Mack v. Williams*, 522 P.3d 854, 872 (Nev. 2022).

23  [196] ECF No. 1 at 7, 11, ¶¶ 48, 77–81.

    [197] ECF No. 143 at 10–12, 20.

1

2

###### 1.    *Salazar's frisk, conducted during a lawful stop, violated clearly established Fourth Amendment law prohibiting unreasonable searches.*

3    Salazar argues that her frisk didn't violate the Fourth Amendment but, even if it did, she

4    is entitled to qualified immunity because her actions didn't violate clearly established law.[198]

5    During a *Terry* stop, an officer "may conduct a brief pat-down (or frisk) of an individual when

6    the officer reasonably believes that 'the person[] with whom [s]he is dealing may be armed and

7    presently dangerous.'"[199]  To determine whether a frisk comports with the Fourth Amendment,

8    courts must ask "whether a reasonably prudent [person] in the circumstances would be warranted

9    in the belief that [her] safety or that of others was in danger."[200]  The investigating officer must

10   provide "specific and articulable facts" justifying her belief.[201]  The Ninth Circuit has identified a

11   "wide variety of factors" that may support an officer's reasonable belief that a suspect is armed

12   and dangerous, including "an officer's observation of a visible bulge in an individual's clothing,

13   . . . sudden movements or repeated attempts to reach for an object not immediately visible, . . .

14   and the nature of the suspected crime."[202]

###### a.    *Salazar's frisk violated the Fourth Amendment.*

16   The record shows that the reason Patterson got searched was that Salazar perceived him

17   as insolent.  Salazar frisked Patterson immediately after she asked him, "Do you have any

18   weapons on you, sir?," and he responded, "I do not answer any questions."[203]  During her

19

---

20   [198] *Id.* at 10–12.

21   [199] *United States v. I.E.V.*, 705 F.3d 430, 434 (9th Cir. 2012) (quoting *Terry*, 392 U.S. at 30).

     [200] *Id.* at 435 (quoting *Terry*, 392 U.S. at 27).

22   [201] *Id.* (quoting *Terry*, 392 U.S. at 21).

23   [202] *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (cleaned up).

     [203] *See* Salazar's body-cam footage, T03:30:30–03:31:30Z.

deposition, Salazar said that she did this "because [of] the way he was hesitant towards me."[204]
She later elaborated that she believed "he kept reaching to his pocket, so I felt like he might have
something."[205]  She also noted that it was dark outside and she "couldn't see very much."[206]
When asked why she didn't frisk two other cyclists she cited earlier that evening, she responded,
"They were very cooperative towards me."[207]

None of this justified the frisk.  Patterson was suspected of committing a misdemeanor
traffic violation on a bicycle, and nothing about that infraction supports a reasonable suspicion
that he was armed or dangerous.  The same is true of Patterson's "hesitant" behavior.  Salazar
admits that Patterson remained "polite" in the minute leading up to the frisk, even as he was
challenging the legality of her actions.[208]  There is no indication in the record that Salazar
perceived Patterson's demeanor as threatening or dangerous or that any such perception would
be reasonable under these circumstances.[209]  And though he questioned Salazar's conduct,
Patterson was compliant with her requests to approach her patrol car.

Salazar offers no authority for the proposition that Patterson's refusal to answer the
potentially incriminating question, "Do you have any weapons on you, sir?" could support a
reasonable suspicion that he was armed or dangerous.[210]  It is also well-settled in the Ninth
Circuit that "mere nervous or fidgety conduct and touching of clothing" alone cannot justify a

---

[204] ECF No. 137-3 at 53 (195:23–24).

[205] *Id.* (196:22–23).

[206] *Id.* (196:23–24).

[207] *Id.* (197:15–16).

[208] ECF No. 137-3 at 49 (178:8–179:2).

[209] *See Ramirez*, 560 F.3d at 1022 (finding that a defendant's "testy" responses to the officer do "not support a finding that [the defendant] had a weapon"); *Velazquez*, 793 F.3d at 1019.

[210] *See Thomas v. Dillard*, 818 F.3d 864, 884–85 (9th Cir. 2016) (holding that a suspect's refusal to consent to a search doesn't support a reasonable belief that the suspect is armed).

*Terry* search.[211]  Salazar's body-cam footage shows Patterson put away his phone in a bag attached to his bike, move his bike out of the way at Salazar's instruction, and briefly adjust his shirt.[212]  None of these actions supports a reasonable suspicion that Patterson had weapons concealed on his body.

Salazar's counsel offers several other reasons that Patterson could have been armed and dangerous, but they're not supported by evidence in the record.  Counsel argues that downtown Las Vegas is a high-crime area, so extra diligence is required.[213]  But the Ninth Circuit has held that "[e]ven in high-crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted."[214]  Plus, this wasn't a situation in which the stop was related to the prevalence of crime in the area: a group of people on bicycles was disregarding stop signs.

Counsel also proposes that Salazar had a reasonable fear for her safety because "she was completely outnumbered by cyclists."[215]  The record doesn't support this theory either because the video evidence shows that by the time Salazar arrived, there were just a few cyclist-stragglers in the area.[216]  Salazar also testified at deposition that she didn't "remember seeing any . . . other cyclists" and agreed that Patterson "was alone" when she approached him.[217]  But even if other

---

[211] *I.E.V.*, 705 F.3d at 438 (citing favorably *United States v. Ford*, 333 F.3d 839, 842, 845 (7th Cir. 2003), which found no justification for a pat-down when the defendant "appeared nervous, looked around, stepped backward and reached for his pocket after he activated [a] metal detector").

[212] Salazar's body-cam footage, T03:30:40–03:31:40Z.

[213] ECF No. 143 at 10.

[214] *Dillard*, 818 F.3d at 877 (quoting *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990)) (cleaned up).

[215] ECF No. 143 at 11.

[216] *See* Salazar's body-cam footage, T03:30:00–45Z.

[217] ECF No. 137-3 at 36 (127:1–12).

1  cyclists under suspicion of violating traffic laws had been swarming, that wouldn't support any

2  rational belief that Patterson was armed.

3       Counsel's final suggestion is that Salazar's frisk was legal because Patterson was wearing

4  "baggy clothes."[218]  But, as the Ninth Circuit has held, the fact "[t]hat a person is normally

5  dressed does not give rise to reasonable suspicion [that] the person is armed and dangerous.

6  Otherwise, innumerable college students everywhere could be frisked for weapons on

7  appearance alone."[219]  Without some specific and articulable facts that support a belief that

8  Patterson may have been hiding a weapon in those baggy clothes, that style choice doesn't

9  establish the requisite reasonable suspicion.

10       In sum, the totality of the circumstances provides no genuine dispute that Salazar violated

11  the Fourth Amendment when she frisked Patterson.  I emphasize that this stop was not one

12  prompted by the suspicion of violent or felonious crime in the area, nor was there any articulated

13  suspicion that the cyclists were engaged in criminal activity other than ignoring traffic-control

14  devices.  Within mere seconds of her arrival on this scene, Salazar initiated a search of a man

15  who was merely standing on a sidewalk next to his bicycle, and for the primary reason that he

16  was "hesitant" to answer her inquiries.  The Fourth Amendment doesn't tolerate this intrusion.[220]

17

18  [218] ECF No. 143 at 11.  Patterson denies that his clothes were baggy, pointing to the video
    evidence showing that his shirt was tight around his midsection and hung past his pockets.  Even

19  if I accept Salazar's characterization of Patterson's clothing, her argument fails, so this
    disagreement doesn't raise a genuine issue.

20  [219] *Dillard*, 818 F.3d at 884.

21  [220] Salazar summarily argues that, even if the search was not permissible as part of a *Terry* stop,
    it was "a legitimate search incident to arrest."  ECF No. 143 at 11.  But "[p]robable cause to

22  arrest must exist *before* an officer undertakes a search incident to arrest."  *United States v.
    Potter*, 895 F.2d 1231, 1234 (9th Cir. 1990).  Throughout the briefing, Metro and Salazar

23  maintain that Salazar had probable cause to arrest Patterson for a traffic violation after she spoke
    with Officer Maglich, ECF No. 135 at 4; ECF No. 143 at 4, and to arrest for obstruction after
    Patterson refused to confirm his address, ECF No. 150 at 8 ("Plaintiff's refusal to provide basic
    identifying information necessary to identify him, such as confirmation of his address, created

### b.    *Salazar isn't entitled to qualified immunity on Patterson's Fourth Amendment unreasonable-search claim.*

Salazar argues that she didn't violate clearly established Fourth Amendment law when she frisked Patterson because "[t]here is no hard and fast rule on when it is appropriate to frisk a suspect."[221]  So, she contends, she "is entitled to qualified immunity as it was her discretionary opinion that it was necessary for her protection" to frisk Patterson.[222]  This, however, is not how qualified immunity gets triggered.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law."[223]  Though there appears to be no identical case in which an officer patted down a nonthreatening bicyclist who fidgeted with his shirt once during a stop for possibly violating traffic laws, an amalgamation of the relevant case law clearly establishes that Salazar did not have a reasonable suspicion to frisk Patterson for weapons.  In *United States v. Flatter*, the Ninth Circuit held that officers who conducted a pat-down search of a person without any observable bulges in his clothing, who did not "act in a threatening manner," and who was suspected of a crime that is not "frequently associated with weapons" violated the suspect's Fourth Amendment rights.[224]  In *Ramirez v. City of Buena Park*,

---

probable cause to arrest for obstructing a public officer under NRS 197.190." (cleaned up)).  Both of those events occurred several minutes after Salazar frisked Patterson, and I have concluded that the collective-knowledge doctrine does not impute Maglich's knowledge to Salazar any earlier.  *See supra* at 29–32.  So Salazar's frisk was not a legal search incident to arrest.

[221] ECF No. 143 at 12.

[222] *Id.*

[223] *Ashcroft*, 562 U.S. at 743 (cleaned up).

[224] *United States v. Flatter*, 456 F.3d 1154, 1158 (9th Cir. 2006).

the court held that frisking a suspect merely because he was being "testy" when responding to officer commands violated clearly established law.[225]  In *Velazquez v. City of Long Beach*, the court reaffirmed that "Ninth Circuit law clearly establishes the right verbally to challenge the police" and that "verbal protests cannot support" an obstruction arrest.[226]  And in *United States v. I.E.V.*, the Ninth Circuit held that "mere nervous or fidgety conduct and touching of clothing" does not give rise to reasonable suspicion that a suspect is armed and dangerous.[227]  So I find that Salazar violated clearly established law when she frisked Patterson, and I grant summary judgment in Patterson's favor on Salazar's liability for his claim that the pat-down constituted an unlawful search under the Fourth Amendment.

### 2. Salazar also violated the Fourth Amendment when she handcuffed Patterson without justification.

Patterson separately claims that Salazar violated his constitutional rights when she handcuffed him immediately after the frisk.[228]  He characterizes this handcuffing as a de facto arrest because Salazar admits that she lacked probable cause to arrest him at this point, and no special circumstances existed that would have permitted handcuffing him as part of the *Terry* stop.[229]  Because Salazar herself doesn't dispute that she didn't have probable cause at this point

---

[225] *Ramirez*, 560 F.3d at 1022–23.

[226] *Velazquez*, 793 F.3d at 1019 (quoting *Mackinney v. Nielson*, 69 F.3d 1002, 1007 (9th Cir. 1995)); *see also Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 699 (9th Cir. 2023) (relying on *Houston v. Hill*, 482 U.S. 451, 462 (1987) and *United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001) to conclude that the plaintiff's "right to verbally challenge police is clearly established").

[227] *I.E.V.*, 705 F.3d at 438.

[228] ECF No. 137 at 20–21.

[229] *Id.*

in the encounter, I analyze this intrusion under the law concerning when an officer may handcuff a suspect during a *Terry* stop.[230]

To be sure, handcuffing "is not part of a typical *Terry* stop."[231] "Under ordinary circumstances, when the police have only a reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment."[232] Nevertheless, courts "allow intrusive and aggressive police conduct without deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers."[233] "Because handcuffing substantially aggravates the intrusiveness of a detention, it follows that circumstances [that] would justify a detention will not necessarily justify a detention by handcuffing.  More is required."[234]

Courts in this circuit consider "both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken."[235] The Ninth Circuit has "allowed the use of especially intrusive means of effecting a stop [only] in special circumstances, such as" (1) when "the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight," (2) when "the police have information that the suspect is currently armed," (3)

---

[230] ECF No. 135 at 4; *see also supra* at 29–32 (concluding that the collective-knowledge doctrine doesn't establish probable cause before Maglich allegedly informed Salazar that he witnessed Patterson run a stop sign).

[231] *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).

[232] *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996).

[233] *Id.* at 1186.

[234] *Meredith v. Erath*, 342 F.3d 1057, 1063 (9th Cir. 2003).

[235] *Lambert*, 98 F.3d at 1185.

1  when "the stop closely follows a violent crime," or (4) when "the police have information that a

2  crime that may involve violence is about to occur."[236]

3        None of these circumstances was present here.  Salazar admitted at deposition that she

4  did not believe Patterson was a threat after she frisked him for weapons and found none.[237]  She

5  justified her decision to handcuff him based solely on "his demeanor."[238]  Though Patterson was

6  verbally challenging Salazar's actions, he cooperated with her commands to walk toward her

7  vehicle and was compliant in her weapons search.  The stop did not follow a violent crime or

8  precede any potential violent crime.  Rather, Salazar was one of the many officers stopping

9  bicyclists on the communicated information that, an hour earlier, a large group of bike riders was

10 violating traffic laws.  And the record is devoid of any evidence that Salazar was concerned

11 about Patterson fleeing the scene.  Under these circumstances, handcuffing Patterson before

12 acquiring probable cause to arrest him was unreasonable and violated Patterson's Fourth

13 Amendment rights.[239]

14

15        **3.    *Salazar is entitled to qualified immunity on Patterson's excessive-force claim, but his battery claim proceeds to trial.***

16        Patterson also asserts claims for excessive force and battery based on Salazar's conduct

17 during the de facto arrest.  He doesn't move for summary judgment on those claims,[240] but

18 Salazar does—arguing that because Patterson didn't allege physical injury from the handcuffs,

19 _____

[236] *Id.* at 1189.

20 [237] ECF No. 137-3 at 57 (209:14–22) (agreeing that Patterson "wasn't a threat" after she frisked him).

21 [238] *Id.*

22 [239] Salazar alternatively contends that handcuffing Patterson was lawful because she had probable cause to arrest him.  As explained *supra* at 29–32, Salazar did not have probable cause to arrest Patterson when she handcuffed him.

23 [240] *See generally* ECF No. 137.

1  he cannot prove an excessive-force or battery claim.[241]  She adds that she is entitled to qualified

2  immunity from his excessive-force claim.[242]

3       Salazar's argument that Patterson's excessive-force claim fails for lack of injury is legally

4  unsound.  The Ninth Circuit has held that "injuries are not a precondition to [§] 1983 liability,"[243]

5  and the "law of this circuit entitles a plaintiff to an award of nominal damages if the defendant

6  violated the plaintiff's constitutional right, without a privilege or immunity, even if the plaintiff

7  suffered no actual damage."[244]  Salazar also doesn't establish that Nevada law requires a

8  showing of actual injury to prevail on a battery claim.  Indeed, the Ninth Circuit has noted that

9  "[t]he standard for common-law assault and battery by a police officer . . . mirrors" the federal

10  civil-rights standard.[245]  The absence of an injury is thus not dispositive for these excessive-force

11  and battery claims.

12       But Salazar's qualified-immunity defense to the excessive-force claim does have merit.

13  She argues that no clearly established law would have put her on notice that using this minimal

14  force under these circumstances would violate the Fourth Amendment.[246]  Patterson doesn't

15  respond to this argument at all—indeed, he doesn't respond to any of Salazar's arguments

16  concerning his excessive-force and battery claims.  Because the burden is on the plaintiff to show

17  that clearly established law prohibited an officer's actions, and Patterson in no way meets that

18  burden here, Salazar is entitled to qualified immunity on Patterson's Fourth Amendment

19

---

20  [241] ECF No. 135 at 22.

21  [242] *Id.*

22  [243] *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018).

    [244] *Wilks v. Reyes*, 5 F.3d 412, 416 (9th Cir. 1993).

23  [245] *Williams v. City of Sparks*, 112 F.4th 635, 647 (9th Cir. 2024).

    [246] ECF No. 135 at 22.

1  excessive-force claim.[247]  But because qualified immunity doesn't extend to state-law claims and

2  Salazar hasn't shown that no evidence supports Patterson's battery claim, the battery claim

3  proceeds to trial.

**H.    Salazar hasn't carried her burden to show that she is entitled to summary judgment on Patterson's First Amendment retaliation or malicious-prosecution claims.**

6      Patterson claims that Salazar violated his First Amendment rights when she "initially

7  detained [him] in retaliation for . . . filming public polic[e] conduct."[248]  Salazar moves for

8  summary judgment on that claim.[249]  She first argues that "discovery revealed" Patterson's First

9  Amendment allegations "to be knowingly false," relying on Patterson's responses to a set of

10  requests for admission in which Patterson admits that he "was not recording police activity on

11  [his] cell phone just prior to or during the subject arrest."[250]  Salazar also argues that there is no

12  other evidence that she took any action *because of* Patterson's First Amendment activity.  She

13  and Metro repeat largely the same argument against his malicious-prosecution claim, suggesting

14  that because Patterson's First Amendment claim fails and Salazar had probable cause to arrest

15  him, his malicious-prosecution claim against both defendants fails too.[251]

16      Salazar's contention that she couldn't have been retaliating against him for filming the

17  police because he admitted that he didn't record police activity on his phone is a distraction.  It is

---

19  [247] Excessive-force and unreasonable-seizure claims are distinct, *see Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1047–51 (9th Cir. 2014), so I do not impute Salazar's one-sentence

20  invocation of qualified immunity from Patterson's excessive-force claim to Patterson's separate (though legally overlapping) unreasonable-seizure claim.

21  [248] ECF No. 1 at 7, ¶ 45.

22  [249] ECF No. 135 at 18.  Patterson doesn't move for summary judgment on his First Amendment or malicious-prosecution claims.  *See* ECF No. 137 at 2–3.

23  [250] *Id.* (ECF No. 135-5 at 6 (Patterson's response to request for admission No. 13)).

[251] *Id.* at 28–29.

undisputed that Patterson was filming this encounter with a GoPro camera mounted to his bike's

handlebars, not his phone.  The real issue that precludes summary judgment, however, is the

open question of whether Salazar saw the GoPro and knew it was hot.  Salazar testified at her

deposition that she didn't know Patterson was filming.[252]  But the video evidence clearly shows a

device mounted to Patterson's handlebars that was visibly blinking red (a common sign that a

camera is recording) as Salazar initiated her encounter with Patterson.[253]  Given that evidence,

whether Salazar's testimony is to be believed is subject to a credibility determination that only

the jury can make.  And though Salazar states that Patterson hasn't provided any additional

evidence to support his First Amendment claim, she doesn't say what more should be required.

A genuine dispute thus remains over whether Salazar knew Patterson was filming her and

retaliated against him on that basis.

Salazar's theory that she couldn't be retaliating if she had probable cause to arrest

Patterson also requires a jury determination of the facts.  I have concluded that Salazar lacked

probable cause to arrest Patterson for obstruction and that a genuine dispute of fact precludes a

finding of probable cause for a traffic violation.  So this retaliation question must go to a jury.[254]

And because Salazar and Metro rely on the same arguments to seek judgment on Patterson's

malicious-prosecution claim, summary judgment is unavailable on that claim too.[255]

---

[252] ECF No. 137-3 at 80 (302:5–11).

[253] *See* Salazar's body-cam footage, T03:30:34–59Z.

[254] Patterson also asserts a free-speech claim under the Nevada Constitution.  ECF No. 1 at 8, ¶ 56.  Because Nevada's constitutional analysis for free-speech claims mirrors First Amendment analysis, *see Univ. & Comm. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004), Patterson's state claim must go to the jury, too.

[255] *See Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011) (noting that police officers and investigators who wrongfully caused a plaintiff's prosecution can be held liable for malicious prosecution); Nev. Rev. Stat. § 193.0175 (permitting an inference of malice "from an act done in

**I.    Salazar is entitled to summary judgment on Patterson's Fifth Amendment claim because Patterson has not shown that he had a reasonable fear that providing identifying information would incriminate him.**

Finally, Patterson claims that Salazar's actions, "including forcing [him] to provide information beyond that which is required under *Hiibel* and then arresting [him] for failing to provide more than his name violated [his] Fifth Amendment right to be free from being forced by the government to provide incriminating evidence."[256]  Salazar moves for summary judgment on this self-incrimination claim, arguing that Patterson's refusal to provide identifying information "was not rooted, or articulated, in any appreciable fear that the information could be used to incriminate him . . . ."[257]  Patterson doesn't meaningfully respond to this argument.

The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to give testimony against himself."[258]  "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled."[259]  The privilege "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."[260]

Patterson fails to explain how or why he reasonably believed that his identifying information could be used in a criminal prosecution.  The same deficiency doomed the *Hiibel* plaintiff's Fifth Amendment claim.  As the United States Supreme Court explained, "[w]hile we recognize petitioner's strong belief that he should not have to disclose his identity, the Fifth

---

willful disregard of the rights of another, or an act wrongfully done without just cause or excuse").

[256] ECF No. 1 at 7, ¶ 47.

[257] ECF No. 135 at 19.

[258] U.S. Const. amend. V.

[259] *Hiibel II*, 542 U.S. at 189 (citing *United States v. Hubbell*, 530 U.S. 27, 34–38 (2000)).

[260] *Id.* at 190 (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)).

1  Amendment does not override the Nevada [l]egislature's judgment to the contrary absent a

2  reasonable belief that the disclosure would tend to incriminate him."[261]  So I grant summary

3  judgment in Salazar's favor on Patterson's Fifth Amendment claim and his analog state-law

4  claim under the Nevada Constitution.

5                                               **Conclusion**

6           IT IS THEREFORE ORDERED that Plaintiff Kelly Patterson's motions for summary

7  judgment against the Las Vegas Metropolitan Police Department and the City of Las Vegas

8  **[ECF Nos. 119 and 121] are DENIED**.

9           IT IS FURTHER ORDERED that the City of Las Vegas's motion for summary judgment

10  **[ECF No. 134] is GRANTED**.  **The Clerk of Court is directed to TERMINATE** the City of

11  Las Vegas as a defendant.

12          IT IS FURTHER ORDERED that the Las Vegas Metropolitan Police Department and

13  Salim Salazar's motion for summary judgment is **[ECF No. 135] is GRANTED in part**:

14  • Metro is entitled to summary judgment in its favor on all constitutional claims against it;

15  • Salazar is entitled to summary judgment on Patterson's claim that his obstruction arrest

16      violated his Fifth Amendment right against self-incrimination because no facts support

17      that claim;

18  • Salazar enjoys qualified immunity from Patterson's excessive-force claim; and

19  • Salazar enjoys qualified immunity from Patterson's Fourth Amendment unlawful-arrest

20      claim founded on the theory that she lacked probable cause to arrest him for obstruction

21      because he failed to identify himself to her satisfaction.

22  • Salazar and Metro's motion is denied in all other respects.

23

---

[261] *Id.* at 191.

IT IS FURTHER ORDERED that Patterson's motion for summary judgment against Salim Salazar **[ECF No. 137] is GRANTED in part**:

- Patterson is entitled to summary judgment as to Salazar's liability for his Fourth Amendment unlawful-search-and-seizure claim for unreasonably frisking and handcuffing him during a *Terry* stop. The question of damages for these Fourth Amendment violations proceeds to trial; and

- Patterson is entitled to summary judgment as to Salazar's liability for his unlawful-arrest claim under Article 1, Section 18 of the Nevada Constitution. The question of damages for this state constitutional claim proceeds to trial.

- Patterson's motion is denied in all other respects.

**So this case proceeds to trial only on:**

- Patterson's Fourth Amendment unlawful-arrest claim against Salazar based on the theory that she lacked probable cause to arrest him for running a stop sign;

- Patterson's First Amendment retaliation claim against Salazar,

- Patterson's battery claim against Salazar,

- Patterson's malicious-prosecution claim against Salazar and Metro;

- Damages for Patterson's Fourth Amendment claims against Salazar for unlawful search and seizure for the frisk and handcuffing; and

- Damages for Patterson's unlawful-arrest claims against Salazar under Article I, Section 18 of the Nevada Constitution.

1    IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for**

2  **a mandatory settlement conference**.  **The parties' obligation to file a joint pretrial order is**

3  **STAYED** until 10 days after that settlement conference.

4    _____

   U.S. District Judge Jennifer A. Dorsey

5    August 26, 2025

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23